[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 26, 2006
THOMAS K. KAHN
CLERK

_____

No. 03-14413

_____

D. C. Docket No. 01-08084-CR-JAL

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ELROY ANTONIO PHILLIPS,
a.k.a. 86,
a.k.a. 6,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(April 26, 2006)**

Before DUBINA and KRAVITCH, Circuit Judges, and STROM[*], District Judge.

_____

[*] Honorable Lyle E. Strom, United States District Judge for the District of Nebraska, sitting by designation.

KRAVITCH, Circuit Judge:

Defendant Elroy Phillips was convicted on five of twenty-one counts in a second superceding indictment charging him with narcotics and firearms offenses. On appeal he challenges his conviction and sentences. We affirm the conviction but reverse and remand for resentencing.

## I. Background

On January 31, 2002, Phillips and co-defendants Ben Black, Jr. and Theresa Ann Hanif were charged in a second superceding indictment with various federal narcotics and firearms offenses. At trial, the government's case against Phillips focused on his and others' distributing, conspiring to distribute, and manufacturing crack cocaine and powder cocaine from Apartment 2 at 625 8th Street and 1103 35th Street, both in West Palm Beach, Florida. Several other individuals, including James Yearby, Stephanie White, Rufus Williams, and Roscoe Cooper, were also indicted for drug activities at 625 8th Street and in the surrounding area. Several of the counts against Phillips involved drug sales by at least one of these individuals to a confidential informant ("CI") or undercover law enforcement officer. Yearby, White, Williams, Cooper, and Black pleaded guilty and agreed to testify against Phillips. The government disclosed that all the cooperating defendants received limited use immunity and other assistance from the

2

government and all but White were convicted felons.

The government's theory was that even though the individuals conducting the day-to-day drug sales at 625 8th Street changed every few months, Phillips was the distributor and ringleader who consistently operated 625 8th Street from late 1999 to May or June 2001. The dealers at 625 8th Street mainly sold crack cocaine, which several witnesses said Phillips made at 1103 35th Street and usually had others deliver to 625 8th Street. According to Williams's testimony, by early 2000, Dwayne Morley was selling drugs from 625 8th Street for Phillips. Williams testified that Morley eventually left Phillips's employ and started selling drugs from a location adjacent to 625 8th Street at 7th Street and N. Rosemary Avenue in West Palm Beach. White testified that several individuals sold from early 2000 until September 2000, including herself and Yvelle Phillips, the defendant's sister. In September or October 2000, Yearby, who formerly worked for Morley, became the primary seller at 625 8th Street, working principally with Cooper. Yearby testified that in mid-March 2001, he stole Phillips's car and some of Phillips's drugs and left for Miami. Black testified that he began selling drugs for Phillips at 625 8th Street in mid-March 2001, working with "a dude named Aunte" and "a dude named Unc" at times, and left in early May 2001.[1]

_____

[1] Both Yearby and Black denied knowing each other. Viewing Black's and Yearby's testimony in the light most favorable to the government, Phillips recruited Black to replace

3

The government presented detailed evidence from the cooperating defendants, local police officers, and members of the Drug Enforcement Administration ("DEA") to prove the charges against Phillips. For example, White testified that she lived with Phillips at 1103 35th Street from March to December 2000 and occasionally thereafter until her arrest in April 2001. According to White, she spent most of her time from March to December 2000 at 1103 35th Street. She testified that she saw Phillips with powder cocaine in the apartment numerous times and explained how Phillips converted the powder cocaine into crack cocaine to sell at 625 8th Street. White admitted to being an active member of a conspiracy run by Phillips to distribute drugs from 625 8th Street, primarily by packaging the crack cocaine into small baggies, delivering the baggies to the sellers at 625 8th Street once or twice daily, and collecting the proceeds from the drug sales. She also stated that she accompanied Phillips to Miami a few times to purchase amounts of powder cocaine ranging from a few ounces to a half-kilogram and once saw an individual deliver powder cocaine to Phillips at 1103 35th Street. White was arrested on April 11, 2001 and pleaded guilty to two narcotics offenses stemming from a sale to a CI.

Yearby testified that he began to work for Phillips at 625 8th Street in

Yearby after Yearby left for Miami.

October 2000. Shortly after Phillips hired him, Yearby moved into Apartment 2 at 625 8th Street and lived there until March 2001, sharing the apartment with Cooper for a time; with Phillips's permission, Yearby paid the rent from the drug proceeds.[2] From October 2000 to March 2001, Yearby was the primary seller at 625 8th Street and was responsible for controlling the drugs and drug proceeds and for hiring lookouts to alert him of police in the area. Yearby generally worked everyday from approximately 4:00 p.m. when Phillips arrived with a supply of crack and powder cocaine until 5:00 a.m. Yearby testified that Gene Horn, Phillips, or White would come to 625 8th Street a few times per night with a new supply of drugs. DEA Special Agent Robert Smith testified, and Yearby admitted, that Yearby and Cooper made several large sales of crack cocaine to a CI and him. Yearby was arrested on April 11, 2001 and later pleaded guilty to possession of and conspiracy to distribute five or more grams of crack cocaine.

Williams testified that with Phillips's sister's assistance, he delivered powdered cocaine twice from Miami to Phillips in West Palm Beach. Additionally, he testified that in late 2000 or early 2001 Phillips tried to recruit him to replace Yearby. Williams initially rejected the offer but after a dispute with Morley, Williams started selling crack cocaine for Phillips from Morley's location

---

[2] Yearby testified that Karen Black, an otherwise unidentified individual, rented the apartment but stated that Phillips paid the bills.

at 7th Street and N. Rosemary Avenue. This arrangement continued without Morley's knowledge from January to March 2001. On one occasion in January 2001, Yearby did not have enough crack cocaine for a CI; therefore, Yearby and the CI went to see Williams and Williams sold crack cocaine to the CI. Finally, he testified that Phillips's uncle began selling at 625 8th Street after Yearby left. Williams was arrested in May 2001 following his indictment for the sale to the CI and another sale. He pleaded guilty to one count, and the other was dismissed.

Black testified he began working for Phillips at 625 8th Street in mid-March 2001. A "dude named Unc" was the primary seller for the first two weeks after Black arrived. Black would get the drugs from Phillips or a "dude named Aunte" would deliver them, and Black would give them to Unc to sell and Black would collect the money from Unc. Black also noted that he once saw Phillips and Aunte make crack cocaine at 625 8th Street and once witnessed a drug dealer bring a kilogram of powder cocaine to Phillips. Black pleaded guilty to selling fifty or more grams of crack cocaine and stated that he sold between $3000 and $4000 of powder cocaine and crack cocaine per day five days per week until he left in early May 2001. Black was arrested on June 16, 2001.

West Palm Beach Police Department ("WPB PD") Agent Michael Ghent testified that on April 6, 2001, he and a CI went to 625 8th Street to make a

controlled purchase of crack cocaine. Ghent testified that he was aware of the DEA's investigation in the area but did not know the specifics and that he began surveillance in the area in January 2001 after receiving citizens' complaints and hearing from other officers about drug activity in the area. When they arrived, Ghent and the CI observed Phillips across the street from 625 8th Street leaning against a green truck with a license plate reading Trojan P. The CI identified Phillips as "86," a nickname several witnesses identified as Phillips's nickname. The CI approached Phillips and, with Ghent within an arm's reach, asked Phillips for a "50 pack."[3] Then, Phillips went to Apartment 2, where he remained inside for two to three minutes. When Phillips returned, he handed the CI five small, green baggies each containing one rock of crack cocaine in exchange for $50.

Ghent returned to 625 8th Street on April 20, 2001 – this time he was alone – and attempted to make a purchase from Apartment 2. He approached the apartment from the rear, and an older, black man exited Apartment 2 and asked Ghent what he needed. Ghent responded that he wanted "lays,"[4] and he asked for 86. The older man told Ghent that Ghent would have to ask 86 about purchasing

---

[3] Ghent testified that a "50 pack" is $50 worth of crack cocaine.

[4] Ghent testified that "lays" is "a common street term for a drug dealer to purchase larger amounts of crack cocaine . . . ."

7

lays and told him that 86 was at the Sunset Club.[5]  The older man stated that he

only had smaller amounts of crack cocaine and showed Ghent approximately 300

bags containing $5 or $10 rocks of crack cocaine.  When Ghent asked the older

man to get 86, the older man refused and told Ghent that he would have to get 86.

Ghent left the area without purchasing drugs or having any contact with Phillips.

Ghent returned to 625 8th Street again on April 24, 2001.  He was alone but

had other agents monitoring him with an electronic listening device.  Ghent walked

to the rear door of Apartment 2 and purchased five $10 rocks of crack cocaine

from a man he later identified as Ben Black.

WPB PD patrol officer Tony Marchese testified that he and Officers Gallon,

McCatlan, and Campagnano were outside the Sunset Club in the early morning of

June 8, 2001.  Phillips was also at the Sunset Club, and when Marchese saw

Phillips he asked McCatlan for Phillips's real name because he only knew Phillips

as 86.  McCatlan did not know Phillips's name either, and he radioed his patrol

supervisor, Sergeant King, to determine Phillips's name.  King responded that 86's

name was Elroy Phillips and that there were federal warrants for his arrest.  King

authorized the officers to stop Phillips.

When Phillips left the club in his truck, the four officers followed, each in

---

[5] Several witnesses testified that Phillips often went to the Sunset Club.  The club is
located at 609 8th Street, just a few hundred yards from 625 8th Street.

his own vehicle. As Phillips proceeded down the road, he threw what appeared to be glass from his vehicle, and Gallon initiated a stop. Phillips pulled over, but when he stopped, he immediately exited his truck and walked to Gallon's car. The other three officers were also at the scene. Phillips refused to comply with Gallon's request to return to his truck, and when Gallon asked Phillips for his driver's license, insurance, and registration, Phillips told Marchese to retrieve the items from his truck. Marchese testified that Phillips's truck had a license plate that read "Trojan P" and that he later learned that the vehicle was registered to Phillips's business, Trojan P.

Marchese went to Phillips's truck to find the items, and when looking in Phillips's truck, Marchese found on the console a cut off straw and a $100 bill that appeared to have powder cocaine on it. Marchese testified that from his experience, he knew that these items were indicative of cocaine use. Marchese told Gallon about the items he found, and at about the same time, Phillips put his hands in his pockets. Phillips refused to comply with Gallon's request to remove his hands from his pockets; then he pulled his hands from his pockets, threw money into the air, and ran away from the officers.[6] Marchese quickly caught Phillips, placed him under arrest, and when searching him, found a bag of powder cocaine

---

[6] Campagnano later testified that the money totaled more than $1000, but he could not recall the exact amount.

in his pocket.

DEA Special Agent John Enockson testified that shortly after Phillips's arrest, he compiled information to obtain a search warrant for Phillips's townhouse at 1103 35th Street. DEA Agents Brad Uhl and Brian Smith testified that upon Enockson's request, they secured the residence until Enockson obtained a search warrant. Uhl and Smith arrived in unmarked vehicles at 7:00 on the morning of June 8, 2001. They sat in Uhl's vehicle on the side of the building and remained at the location until 4:30 p.m. when Enockson arrived with the search warrant. Uhl testified that he and Smith occasionally patrolled around the townhouse but spent most of their time in one location. Furthermore, Uhl testified that he participated in the search of Phillips's townhouse and learned that the sliding glass door in the rear of the residence had an alarm. Uhl never heard an alarm from the time he arrived in the morning until Enockson arrived with the search warrant.

At approximately 12:15 p.m., a blue Chevy pulled up in front of the townhouse at 1103 35th Street. A heavy set black woman exited the vehicle, approached Smith's undercover vehicle, and unsuccessfully tried to open the passenger side door. When the agents questioned the woman, she said that she believed the vehicle was her brother's rental car and that the keys to her brother's residence were in the vehicle. The woman identified herself as Yvonne Phillips,

10

and the agents told her that Elroy Phillips was arrested earlier that day and that they were obtaining a search warrant for his townhouse. She then left the area without incident.

Enockson testified that he and several other agents arrived at approximately 4:30 p.m. to execute the search warrant. When the agents arrived, the townhouse's doors were locked and the windows were barred. An alarm sounded when the agents entered through the front door. Enockson testified that the townhouse was unoccupied but was in disarray, a movie was playing on the television, and boxes were in the townhouse as if someone was packing. White later testified that to her knowledge only she and Phillips had keys to the townhouse during the time she lived there.

When the agents searched the house they found several items commonly associated with the manufacture, use, and sale of powder and crack cocaine: a pan with cocaine residue, a Pyrex glass beaker next to the toilet, money wrappers, small plastic baggies, and a small baggie, a straw, currency, a spoon, and a screen case with cocaine residue. The agents also found a tray that contained a .9 mm magazine for a Taurus handgun and other bullets under the bed in an upstairs room, .38 caliber Remington bullets in the dresser drawer in the upstairs bedroom, a .223 caliber round on the kitchen counter, and a box for a gun. Furthermore, the

11

agents found mail sent to 1103 35th Street with the recipient listed as Elroy

Phillips and a car repair receipt that listed Stephanie White at 1103 35th Street as

the owner of the 1982 Cadillac DeVille with a Trojan P license plate.[7]  Finally, the

agents found a photograph of James Yearby printed from the Florida Department

of Corrections's website; Enockson testified that the website allows individuals to

ascertain information on people currently and formerly incarcerated in the State of

Florida.

The government also presented Phillips's financial information, including

bank statements, receipts for expenses incurred by his lawn care service, receipts

showing he paid bills for his lawn care equipment, and a contract he had to perform

lawn care services for the VA.  In closing, the government argued that Phillips did

not make much money from the VA contract and could not have paid all his

expenses from that salary.

Phillips's defense strategy was to concede that 625 8th Street was a center

for the distribution of powder and crack cocaine but focus on the government's

lack of evidence showing that he dealt or directed others to deal drugs at 625 8th

Street.  The defense noted that only once did a government agent see Phillips

---

[7] WPB PD Agent Brian Kapper testified that he saw a green Ford F250 with a license reading Trojan P parked outside 1103 35th Street on several occasions.  Several witnesses identified the truck as belonging to Phillips.

allegedly dealing drugs in the area, and Phillips contended that the officer and CI mistook Black for him. In his closing, Phillips argued that either Yearby or Morley could have run 625 8th Street.[8]

Even though White testified that Phillips manufactured crack cocaine at 1103 35th Street, the government never conducted surveillance at that location and several trash pulls by WPB PD failed to produce evidence against Phillips. To the extent that a search of the townhouse turned up materials often associated with the possession and sale of powder and crack cocaine, Phillips had several government witnesses concede that his townhouse was clean whenever they were there. Phillips alleged that the townhouse was in disarray when the agents executed the search warrant either because someone else was living there at the time or because the government planted evidence to frame him. Furthermore, the government failed to discover other materials commonly associated with drug dealing – e.g., a scale, large sums of money, and stores of cocaine – that several cooperating defendants testified they regularly saw in Phillips's townhouse. Phillips supported his first argument by getting Agents Smith and Uhl to concede that they arrived at Phillips's house several hours after his arrest and had not watched the entire

---

[8] When a CI mentioned 86 during one undercover buy, Yearby replied, "I make way more money than I usually make over there." Furthermore, Phillips contended that a delivery from White that the DEA caught on tape must have come from Morley's because White could not have arrived so quickly if she were coming from Phillips's townhouse as White alleged she did.

13

building during their time there.  At bottom, Phillips contended that he was a budding businessman with his own lawn care service and that those who testified against him were drug dealers, drug users, and convicted felons, who were just looking to implicate someone else so they could get their sentences reduced.

The jury convicted Phillips on: (1) Count 1 for conspiracy to distribute five or less grams of crack cocaine; (2) Count 9 for distributing a detectable amount of crack cocaine on April 6, 2001; (3) Count 11 for possessing a detectable amount of powder cocaine on June 8, 2001; (4) Count 14 for being a convicted felon in possession of one or more rounds of .38 caliber Remington ammunition from in or about October 2000 through on or about November 1, 2000; and (5) Count 17 for being a convicted felon in possession of one or more rounds of several types of ammunition on June 8, 2001.  Specifically, with regard to Count 1, the jury rejected the indictment's charge that Phillips conspired to distribute fifty or more grams of crack cocaine and convicted him of the lesser included offense.

Pursuant to the U.S.S.G. § 2D1.1, the revised presentence investigation report ("PSI") assessed a base offense level of 32 based on the amount of drugs, 67 grams of crack cocaine, that the district court attributed to Phillips at sentencing.[9]

---

[9] The PSI attributed the following drug quantities to Phillips: (1) the 6.6 grams of crack cocaine that Yearby sold to a CI on November 29, 2000; (2) the 22.3 grams of crack cocaine that Yearby and White sold to a CI on December 13, 2000; (3) the 11.4 grams of crack cocaine that Yearby sold to a CI on December 15, 2000; (4) the 25.4 grams of crack cocaine that Yearby and Cooper sold to a CI on January 12, 2001; (5) the .77 grams of crack cocaine that Phillips sold to

14

The PSI also recommended a two-level increase for each of the following findings made by the district court: (1) Phillips possessed a dangerous weapon during the offense, § 2D1.1(b)(1);[10] and (2) Phillips was an organizer or leader in the criminal activity, U.S.S.G. § 3B1.1(c). The PSI concluded that Phillips qualified as an armed career criminal, pursuant to § 4B1.4(a), and a career offender, pursuant to § 4B1.1(a). Nevertheless, because Phillips's adjusted offense level already was 36, these classifications did not increase his total offense level. The PSI noted that Phillips had a criminal history category of VI based on each of the following grounds: (1) Phillips had been assessed 14 criminal history points; and (2) Phillips was an armed career criminal. Based on a total offense level of 36 and a criminal history category of VI, the PSI calculated a guideline imprisonment range of 324 to 405 months' imprisonment.

Phillips objected to the PSI, arguing that the district court could not sentence him based on acquitted conduct because the jury necessarily rejected the credibility of the government's witnesses, and the witnesses' testimony was not supported by

a CI on April 6, 2001; (6) the .56 grams of crack cocaine that Black sold to Ghent on June 8, 2001; and (7) the .2 grams of powder cocaine that was recovered from Phillips at the time of his arrest.

[10] Several witnesses, including White, Cooper, and Yearby, testified that Phillips often carried a gun with him. The police found a gun box during their search of Phillips's townhouse but did not find any guns. Nor did the police recover any guns from Phillips or his vehicle when they arrested him on June 8, 2001. The indictment included several firearms offenses, and the jury acquitted Phillips of all those counts.

15

physical evidence. Phillips argued that his relevant conduct should not include drug amounts prior to April 6, 2001, because the jury found that he entered the conspiracy on that date. As for the offense level computation, Phillips argued that he only could be held responsible for the .77 grams of crack cocaine he sold to the CI because that was the only sale for which he was convicted. Phillips next objected to the firearm enhancement because: (1) the jury acquitted him of the firearms charges; and (2) ammunition does not constitute a dangerous weapon. Phillips also objected to the role enhancement because the jury acquitted him in relation to the activities of others. Finally, Phillips argued that because the jury's verdict supports a finding that he did not participate in the conspiracy until April 6, 2001, the dates of his prior offenses that were used to establish that he was an armed career criminal and a career offender were not within the time-period of countable offenses under § 4A1.2(e).

After the government filed its response disputing Phillips's arguments, Phillips filed a motion to declare the sentencing scheme unconstitutional, arguing that holding him accountable at sentencing for acquitted conduct violated the Fifth and Sixth Amendments. Specifically, Phillips argued that, because the jury found that his participation in the conspiracy was limited to five or less grams of crack cocaine, the district court was limited to considering that amount of drugs in

16

establishing his base offense level. Phillips also noted that, even though the jury acquitted him of two counts of possession of a firearm by a convicted felon, the PSI proposed enhancing his sentence for possession of firearms. The district court denied Phillips's motion, finding that acquitted conduct could be considered at sentencing if the government proved it by a preponderance of the evidence.

The district court conducted five days of sentencing hearings. Phillips argued that the district court could not enhance his sentence based on acquitted conduct because the jury necessarily determined that the witnesses, whose testimony the government cited in support of the imposition of the sentencing enhancements, were not credible. Phillips supported his argument that the witnesses lacked credibility by calling White who testified that several government witnesses communicated in jail in order to coordinate their testimony. Phillips asserted that his base offense level should be 16, based on the amount of drugs that were related to his convictions: (1) the .77 grams of crack cocaine that he sold to Ghent on April 6, 2001; and (2) the .2 grams of powder cocaine that he possessed when he was arrested on June 8, 2001.

The government argued that the PSI properly attributed 67.03 grams of crack cocaine and .2 grams of powder cocaine to Phillips. According to the government, it proved the weights by a preponderance of the evidence based on the

17

testimony regarding four sales of crack cocaine by Yearby to a CI, Phillips's sale of crack cocaine to a CI, Black's sale of crack cocaine to Ghent, and Phillips's possession of powder cocaine at the time of his arrest. The district court agreed that the government had established, by a preponderance of the evidence and based on clear and convincing evidence, that Phillips was responsible for 67.03 grams of crack cocaine and .2 grams of powder cocaine,[11] resulting in Phillips having a base offense level of 32.

With respect to the § 924(e) enhancement, the government maintained that the time-periods outlined in § 4A1.2 for counting prior convictions were inapplicable to the determination of whether a defendant is an armed career criminal under § 4B1.4. Phillips withdrew his argument that § 4B1.4 had a time element. Thereafter, the district court found that Phillips was an armed career criminal based on the convictions outlined by the government. The district court further noted that Phillips had a criminal history category of VI under § 4B1.4(c)(2) because he was a member of a drug distribution conspiracy and had provided ammunition and a firearm to Yearby in furtherance of the conspiracy. The district court found that Phillips was subject to the § 851 enhancement,

---

[11] The transcript incorrectly states that the district court held Phillips accountable for two grams of powder cocaine. The district court, however, based its drug calculation on the government's contentions. The government argued that, in regards to powder cocaine, Phillips should be held accountable for the .2 grams that the agents recovered from him at the time of his arrest.

resulting in increased punishment under § 841.

Phillips reiterated his objection to being classified as a career offender, arguing that: (1) the time limits outlined in § 4A1.2(e) were applicable to the career offender provision; (2) for him to be classified as a career offender using the time-limits outlined in § 4A1.2(e), two of his prior qualifying felony convictions must have occurred within ten years of his commission of the instant offense; (3) for purposes of § 4A1.2(e), the date when he committed the instant offense was April 6, 2001, because the jury's verdict supports a finding that he joined the conspiracy on that date; and (4) he did not have two prior qualifying felony convictions within ten years of April 6, 2001. The district court accepted the government's argument that Yearby's and White's testimony established that Phillips was involved in the conspiracy in October 2000. Using this date, the district court determined that Phillips was a career offender based on qualifying convictions from November 1990 and May 1994.

The district court also found, by a preponderance of the reliable evidence presented at trial, that Phillips possessed a firearm during and in relation to a drug trafficking conspiracy. Over Phillips's objection, the court ruled that he qualified for a role enhancement, noting that the evidence at trial demonstrated that he was in charge of 625 8th Street and used others to sell illegal narcotics for him. Based

on the district court's drug quantity calculation and its assessment of §§ 2D1.1(b) and 3B1.1(c) enhancements, Phillips had a total offense level of 36.

The district court stated that it was imposing a sentence at "the higher end of the guideline range" of 324 to 405 months' imprisonment and determined that a sentence of 360 months' imprisonment was appropriate based on the seriousness of the offenses, Phillips's criminal history, and the application of the armed career criminal guideline. The district court initially sentenced Phillips to 360 months' imprisonment on both Counts 1 and 9, 24 months' imprisonment on Count 11, and 180 months' imprisonment on both Counts 14 and 17, all to be served concurrently. However, after the probation officer notified the court that its sentence of 180 months' imprisonment on Counts 14 and 17 was outside the guideline range, the court amended its sentence with respect to each of those counts to 360 months' imprisonment to be served concurrently with the remaining counts.

Phillips filed post-trial motions seeking a new trial based on newly discovered evidence and *Brady* violations, to declare §§ 922(g) and 924(e) unconstitutional as applied, to declare Counts 14 and 17 multiplicitious, and to acquit Phillips of the conspiracy count. The district court denied all the motions but agreed to consolidate Counts 14 and 17. Phillips timely appealed, raising five

issues: whether the district erred (1) by determining that sufficient evidence supported Phillips's conviction for conspiracy to distribute crack cocaine, (2) by denying Phillips's motion to declare 18 U.S.C. §§ 922(g) and 924(e) unconstitutional as applied, (3) in denying Phillips's motion for a new trial, (4) by increasing Phillips's sentence based on facts neither found by the jury nor admitted by the defendant, and (5) in failing to dismiss either Count 14 or 17 based on multiplicity. We reverse the district court's holdings on Issues 4 and 5. In all other respects, we affirm the district court.

## II. Discussion

1. *Whether Sufficient Evidence Supported Phillips's Conviction for Conspiracy to Distribute Five or Less Grams of Crack Cocaine.*

On appeal, Phillips challenges the sufficiency of the evidence to support his conviction for conspiracy to distribute five or less grams of crack cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and § 846. Phillips contends that the jury must have convicted him of the conspiracy because it believed that he conspired with the CI in the April 6 transaction, the only sale for which Phillips was convicted. Phillips supports his reasoning by showing that the jury acquitted him of the indicted offenses that underlaid the conspiracy charge – i.e., the sales by Yearby, White, Cooper, and Black, that the district court failed to instruct the jury

21

that a defendant cannot conspire with a government agent, and that the jury

reduced the amount of drugs involved in the conspiracy from fifty grams or more

as listed in the indictment to five or less, which corresponds with the amount

involved in the April 6 transaction. According to Phillips, the only way the jury

could have convicted him of conspiracy is because it erroneously believed that he

conspired with the CI, a government agent, on April 6.  Therefore, he contends that

sufficient evidence does not support his conviction.

When we review a conviction for sufficiency of the evidence, "we apply a *de*

*novo* standard of review, but resolve all reasonable inferences in favor of the jury's

verdict."  *United States v. Pineiro*, 389 F.3d 1359, 1367 (11th Cir. 2004).  "The

evidence is sufficient so long as a reasonable trier of fact, choosing among

reasonable interpretations of the evidence, could find guilt beyond a reasonable

doubt."  *Id.* (citation omitted).  We will uphold the jury's verdict "unless no trier

of fact could have found guilt beyond a reasonable doubt."  *United States v. Lyons*,

53 F.3d 1198, 1202 (11th Cir. 1995) (citation omitted).

Count One charges Phillips: "From at least as early as in or about December,

1999, the exact date being unknown to the Grand Jury, and continuing through on

or about June 8, 2001, in West Palm Beach, Palm Beach County, in the Southern

District of Florida, and elsewhere, the defendants, Elroy Phillips, a/k/a '86' and

22

'6,' and Ben Black, Jr., did knowingly and intentionally combine, conspire, confederate, and agree with each other and with persons known and unknown to the Grand Jury, to distribute a Schedule II controlled substance, that is fifty (50) or more grams of a mixture and substance containing a detectable amount of cocaine base, commonly known as 'crack cocaine.'"  In the special verdict, the jury convicted Phillips of the conspiracy charged but determined that the conspiracy was to distribute five or less grams of crack cocaine.

We note that we doubt whether Phillips preserved his argument that the district court erred by failing to instruct the jury that a defendant cannot conspire with a government agent.  Phillips's argument fails, however, for several reasons. First, the conspiracy as alleged by the government was broader than the counts for which the jury acquitted Phillips.  As alleged in the indictment, the conspiracy dated back to 1999 and included Black and "persons known and unknown to the Grand Jury."  The government presented extensive evidence showing that Phillips conspired with Yearby, Cooper, White, Williams, Morley, Black, and others in obtaining powder cocaine to convert into crack cocaine, manufacturing crack cocaine, and distributing large quantities of crack cocaine over a period of several years.  Several of Phillips's co-conspirators testified that they worked for Phillips when they sold large quantities of crack cocaine from 625 8th Street to many

23

individuals, not just the government agents. As the ultimate finder of fact, the jury was free to accept some of the government's evidence and reject other parts of the government's evidence. The extensive evidence the government presented left the jury with many ways to conclude that Phillips conspired to distribute five or less grams of crack cocaine without necessarily concluding that Phillips conspired with the government agent on the April 6 transaction.

Second, we have held on several occasions that each count in an indictment is a separate count and the jury's decision to acquit on one count does not have *res judicata* effect on any separate count. *United States v. Odom*, 252 F.3d 1289, 1298 (11th Cir. 2001) (citing *Dunn v. United States*, 284 U.S. 390, 393 (1932)). "Consistency in the verdict is not required." *Dunn*, 284 U.S. at 393. In *United States v. Powell*, the Supreme Court reaffirmed *Dunn* and upheld the defendant's conviction even though the jury acquitted her of possession with the intent to distribute cocaine but convicted her of conspiracy to possess cocaine with intent to distribute. 469 U.S. 57, 60 (1984). The case for upholding Phillips's conviction is at least as compelling as it was in *Powell* because, as noted, the government presented extensive evidence of a conspiracy that went beyond the predicate offenses for which the jury acquitted Phillips. Because we conclude a reasonable trier of fact could have found Phillips guilty beyond a reasonable doubt, we affirm

24

his conspiracy conviction.

2. *Whether §§ 922(g) and 924(e) Are Constitutional As Applied to This Case*

Next, Phillips argues that 18 U.S.C. §§ 922(g) and 924(e) are unconstitutional as applied to this case because they violate the Eighth Amendment and the equal protection component of the Fifth Amendment's Due Process Clause and because Congress exceeded its authority under the Commerce Clause when it prohibited the conduct for which the jury convicted Phillips.

Title 18 U.S.C. § 922(g) states in pertinent part: "It shall be unlawful for any person – (1) who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year; . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or *ammunition*; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."  18 U.S.C. § 922(g) (2003) (emphasis added).

Title 18 U.S.C. § 924(e) states: "In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years . . . ."  18 U.S.C. § 924(e)

25

(2003).

Phillips does not dispute that he committed the predicate offenses that made him eligible for sentencing under §§ 922(g) and 924(e).  Instead, Phillips contends that the laws violate the Eighth Amendment and equal protection component of the Fifth Amendment's Due Process Clause because: (1) upon his release from Florida state prison, the Florida Department of Corrections failed to notify him that federal law bans the possession of ammunition by a convicted felon; and (2) punishing an individual for possession of ammunition without proving that the person also possessed a weapon that would make the bullets dangerous lacks a rational relationship to a legitimate governmental purpose.

We hold that Phillips's Eighth Amendment argument must fail.  Phillips's first argument fails because § 922(g) only requires that the defendant knowingly possess the ammunition, not that he knows the possession is illegal.  *United States v. Deleveaux*, 205 F.3d 1292, 1298 (11th Cir. 2000).  The indictment charged Phillips with knowingly possessing the ammunition, and the jury determined that the government proved that element.  Therefore, the government satisfied its burden on that issue.

Phillips's second argument fails because "[t]he Eighth Amendment . . . contains a narrow proportionality principle that applies to noncapital sentences."

*Ewing v. California*, 538 U.S. 11, 20 (2003). In *United States v. Lyons*, we relied on *Ewing* in upholding the conviction and sentence of a defendant, a convicted felon, sentenced to 235 months' imprisonment for possession of four .22 bullets. 403 F.3d 1248, 1256-57 (11th Cir. 2005). Even though a thirty-year sentence for mere possession of ammunition may be greater than necessary to meet the goals of punishment, the decision is for Congress in the first instance, and we cannot conclude on our narrow review that the sentence here amounts to cruel and unusual punishment.

Phillips's equal protection argument also must fail. First, Phillips has not contended that the challenged provisions deserve greater scrutiny because they target a protected class. Instead, he argues that the provisions single out certain individuals because of their criminal history and target those individuals without any legitimate governmental purpose. Convicted felons are not a protected class, *United States v. Jester*, 139 F.3d 1168, 1171 (7th Cir. 1998), therefore, we analyze Phillip's claim to determine whether Congress had a rational basis in passing the challenged provisions.

Phillips contends that without a weapon to discharge the ammunition he undisputedly possessed, the ammunition is not dangerous. Therefore, according to Phillips, Congress's decision to punish possession of ammunition by a convicted

felon without also requiring that the convicted felon possess a firearm is irrational and denies equal protection to convicted felons. We disagree. Just as Congress could rationally decide to punish possession of a firearm by a convicted felon without requiring possession of ammunition, Congress could also rationally decide to punish possession of ammunition by a convicted felon without also requiring possession of a firearm. Congress made a rational decision that certain individuals should be required to separate themselves fully from certain wares common to the criminal enterprise, and it is not for us to invalidate that decision.

Phillips also argues that Congress exceeded its power under the Commerce Clause when it prohibited the conduct for which he was convicted. The cases upon which Phillips relies, however, were vacated in light of the Supreme Court's recent decision in *Gonzalez v. Raich*, 545 U.S. –, 125 S. Ct. 2195 (2005). Even though this case deals with possession of ammunition, we find our § 922(g) precedent dealing with convictions for possession of a firearm persuasive here, and we affirm Phillips's conviction.

Under its Commerce Clause power, Congress can regulate those activities that substantially affect interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558-59 (1995). In *Lopez*, the Court invalidated a federal law prohibiting the possession of a firearm within 1000 feet of a school. *Id.* at 549, 565. In *United*

28

*States v. McAllister*, a case dealing with possession of a firearm in violation of

§ 922(g), we noted that the lack of a jurisdictional element requiring that the

defendant's possession of the firearm affect interstate commerce was the principal

infirmity with the law in *Lopez*.  77 F.3d 387, 389-90 n.4 (11th Cir. 1996).  Like

the portion of § 922(g) challenged in *McAllister*, the portion of § 922(g) applicable

here includes a specific jurisdictional element, ensuring that the possession

affected interstate commerce.  The government alleged in the indictment that the

ammunition was possessed in connection with interstate commerce and presented

evidence that the ammunition in question was manufactured outside the state of

Florida and found at Phillips's townhouse in Florida.  The fact that the ammunition

previously traveled in interstate commerce is sufficient to establish the necessary

jurisdictional nexus, and despite Phillips's argument to the contrary, "[w]here the

class of activities is regulated and that class is within the reach of federal powers,

the courts have no power 'to excise, as trivial, individual instances' of the class."

*Raich*, 125 S. Ct. at 2209 (citing *Perez v. United States*, 402 U.S. 146, 154 (1971)).

Accordingly, we affirm.

3. *Whether the District Court Erred in Denying Phillips's Motions for a New Trial*
*and an Evidentiary Hearing*

Phillips contends that the district court erred in denying his motions for a

new trial and an evidentiary hearing. According to Phillips, the district court ignored his allegations that the government at least concealed, if not fabricated, evidence dealing with the April 6 sale of crack cocaine from Phillips to a CI.

As accounted earlier, WPB PD Agent Michael Ghent testified that on April 6, 2001, he and a CI went to 625 8th Street to make a controlled purchase of illegal narcotics. According to Ghent, he was familiar with Phillips and the area surrounding 625 8th Street because he had conducted surveillance of the area beginning in January 2001 after numerous citizens' complaints and information from other officers that Apartment 2 at 625 8th Street was the source of large amounts of illegal narcotics. During his surveillance, Ghent had observed activities consistent with the distribution of illegal narcotics.

When the CI and Ghent arrived, they saw Phillips, whom the CI identified as 86, leaning against a green truck with a license plate reading Trojan P.[12] Phillips was standing across the street from 625 8th Street; the CI and Ghent approached Phillips, and the CI requested a "50 pack" from Phillips. Phillips then went into Apartment 2 at 625 8th Street, and when he returned, he handed the CI five green baggies, each containing one rock of crack cocaine, in exchange for $50. The CI immediately handed the drugs to Ghent, and the CI and Ghent left the area. Ghent

---

[12] In his trial testimony, Ghent did not explain how he knew Phillips's real name.

testified that he had seen Phillips in the area previously and that on April 6, he stood within a few feet of Phillips as Phillips handed the drugs to the CI.

When Phillips's counsel cross examined Ghent, she had a copy of Ghent's report from the April 6 transaction. The cover sheet to Ghent's report identified Phillips as having a dark complexion, and Ghent conceded that the cover sheet to his report dealing with the April 24 transaction with Black identified Black as having a dark complexion. Ghent also conceded that his report did not describe Phillips's physical features or note that Phillips was leaning on a green truck with a license plate reading Trojan P, but that his report on the April 24 transaction described Black in much greater detail. According to Ghent, Phillips was not the specific target of his investigation at 625 8th Street; his purpose in investigating the location was to determine who was selling illegal narcotics from that location.

On redirect, Ghent testified that he had already identified Phillips as of April 6 and had not identified Black as of April 24, thereby explaining the difference in his police reports. According to Ghent, additional information to identify Phillips was unnecessary because Phillips's identity was not in question. Furthermore, Ghent reaffirmed his statement from the cover sheet attached to the April 6 report that he believes that Phillips has a dark complexion. Finally, Ghent testified that although he was a part of the federal investigation, the DEA did not provide any

31

support for his investigation of 625 8th Street from January to April 2001.

In closing, Phillips, through counsel, suggested that reasonable doubt existed as to whether the CI made the April 6 purchase from Phillips or Black. The jury convicted Phillips of that charge, obviously rejecting Phillips's argument.

Phillips filed a *pro se* motion requesting a new trial based on newly discovered evidence and a *Brady* violation.[13]  First, Phillips alleged that his attorney had made a pre-trial request for all police reports associated with his case; the government provided several reports but did not provide Ghent's report from the April 6 transaction.  Furthermore, before Phillips's trial, a private investigator ("PI") searched the WPB PD database for Phillips's police records and contacts and did not discover any reports from Ghent or a report for the April 6 transaction. A letter from the WPB PD dated December 24, 2001 confirmed that the database did not contain an April 6 report.  Just before Ghent testified on December 16, 2002, the government provided an unsigned copy of Ghent's April 6 report detailing an alleged drug sale by Phillips to a CI.  Phillips also alleged that no supervisor reviewed the report.

Following Phillips's conviction, another PI conducted a search of the WPB

---

[13] In his motion, Phillips also argued that the government violated *Brady* by failing to disclose the entirety of Yearby's and White's agreements with the government.  The district court rejected Phillips's argument, and Phillips did not appeal the district court's ruling on that issue.

PD's police records database. This time, the PI tried to locate the April 6 report using the case number that appears on the report. A records clerk at the WPB PD was unable to locate the report. The WPB PD's Central Records Manager, Sandy LaRue, told the PI that the records department never received the report. When LaRue conducted an additional search, she determined that the case number associated with the April 6 report was generated by Ghent on March 28, 2001, more than a week prior to the drug sale from Phillips to the CI.

In an affidavit attached to Phillips's motion for a new trial, the PI stated that he spoke with Lieutenant Bill Amason, Ghent's supervisor as of July 2003.[14] Amason could not explain the procedure for providing reports to the records department but said that the report may not have been logged into the database because the investigation was turned over to the U.S. Attorney's Office. Amason told the PI that his practice was to initiate a case number for an ongoing investigation and that a report that went to the DEA or U.S. Attorney's Office would not be logged into the system. Finally, Amason said that it is common practice for an agent to initial his reports and have a supervisor review them but noted that that practice does not always occur.

Phillips further alleged that several government witnesses testified that the

---

[14] Amason was not Ghent's supervisor as of April 6, 2001.

investigation into Phillips did not begin until at least April 11, 2001, the date the DEA arrested several of his alleged co-conspirators and several days before the alleged deal on April 6. WPB PD Agent Brian Kapper testified that based on information he received on April 11 from a co-worker, Agent Emmons, he and Emmons conducted "trash pulls" at Phillips's townhouse on April 22, April 25, April 29, May 2, and May 9. Kapper also testified that he provided assistance to Ghent at least once when Ghent made a controlled buy at 625 8th Street; Kapper stated that he used a recording device to track Ghent and ensure Ghent's safety during the transaction. Furthermore, Phillips contended that the federal investigation into his alleged involvement in distributing drugs at 625 8th Street did not begin until at least April 11, 2001. Therefore, Ghent had no reason to withhold the April 6 report.

Finally, Phillips asserted that the drug evidence obtained from the April 6 transaction was listed in the WPB PD Records under a case number associated with Ben Black. According to Phillips, this supports his theory at trial that on April 6, the CI and Ghent dealt with Black. Phillips believes that this evidence alone allows him to meet the standard to obtain a new trial. Phillips goes even further by asserting that the newly discovered evidence taken as a whole shows that Ghent fabricated the report to frame Phillips and that if the jury had the

34

opportunity to consider all the evidence, the jury would not have convicted Phillips of the conspiracy in Count One or the substantive offense in Count Nine.[15]

The government's response included an affidavit filed by Ghent explaining that he obtained the case number listed on the April 6 report on March 28, 2001, following complaints from citizens about the alleged sale of illegal narcotics at 625 8th Street. Kapper purportedly told Ghent on March 28 that Phillips allegedly controlled 625 8th Street and described Phillips's truck. Ghent claimed that he then reviewed photos of Phillips. Ghent stated that he and the CI drove to 625 8th Street on March 28 to make a controlled buy but were not able to do so. Ghent confirmed that he kept the same case number and evidence submission form he obtained on March 28 when he documented the April 6 transaction. According to Ghent's affidavit, he did not file the April 6 report with the central records division because the report was part of an ongoing investigation.

The government also contended that Ghent's report, investigative fund expenditures, and informant contact report for April 6, 2001 corroborated his affidavit. The government argued that Phillips's reliance on a printout that showed that the drug evidence obtained from the April 6 report was listed under a case

---

[15] Phillips also argues that the evidence that allegedly shows that Ghent fabricated the April 6 report provides further support to his argument that the government planted evidence in his townhouse during the June 8 search. Presumably, Phillips believes that if the jury had considered this evidence, the jury would probably have reached a different result on Counts 14 and 17.

number associated with Black was misplaced because the printout was replete with mistakes. Furthermore, Ghent identified Phillips at trial, and when Black testified, the jury had the opportunity to compare Black and Phillips.

The district court determined that it did not need to hold an evidentiary hearing to examine Phillips's allegations deeper and decided based on the trial testimony and the parties' submissions that Ghent's testimony was truthful and consistent with his affidavit and testimony from other government witnesses. The district court also accepted the government's argument why the report did not appear in the WPB PD's central records and why the case number was generated more than a week before the April 6 transaction. Finally, the district court held that Phillips could not obtain a new trial under Rule 33 because Phillips failed to show that with due care the evidence was discoverable only after trial and because the evidence was, at best, impeachment evidence.

A. *Whether the District Court Erred in Denying Phillips's Motion for a New Trial Based on Newly Discovered Evidence*

To establish a claim for a new trial under Federal Rule of Criminal Procedure 33 based on newly discovered evidence, the defendant must show that: (1) the evidence was in fact discovered after trial; (2) the defendant exercised due care to discover the evidence; (3) the evidence was not merely cumulative or

impeaching; (4) the evidence was material; and (5) the evidence was of such a

nature that a new trial would probably produce a new result. *United States v.*

*Bollinger*, 796 F.2d 1394, 1401 (11th Cir. 1986). In determining whether to grant

the motion, the district court should use "great caution." *United States v. Jernigan*,

341 F.3d 1273, 1287 (11th Cir. 2003). We review the district court's ruling for an

abuse of discretion. *United States v. Thompson*, 422 F.3d 1285, 1294-95 (11th Cir.

2005).

We agree with the district court that Phillips has failed to meet the standard

for a new trial under Rule 33. First, Phillips cannot establish that he only

discovered the piece of evidence most critical to his claim after trial. Phillips

admits that he received a copy of the April 6 report the day Ghent took the stand.

At that point, Phillips knew that the WPB PD's central records did not include a

copy of this report. Phillips then had the opportunity to ask Ghent why the report

was not in the records. Phillips also could have asked for a continuance to conduct

the investigation he waited more than six months after his conviction to conduct.[16]

More important, Phillips cannot meet his ultimate burden of establishing that

---

[16] Although we do not consider this as part of our analysis, we note that Phillips likely cannot meet the second step of the test because with due care, he could have discovered the report before the day on which Ghent testified. DEA Agent Enockson's affidavit associated with the search warrant for Phillips's townhouse notes the DEA's reliance on a controlled buy by Ghent and a CI from Phillips on April 6. This information should have caused Phillips to pursue information from the April 6 transaction further when the government did not provide him with a report during discovery.

the evidence here is of such a nature that it would probably produce a new result. The overwhelming evidence establishes that Ghent and the CI went to 625 8th Street on April 6, 2001 and purchased crack cocaine from Phillips. Phillips's PI's affidavit notes a conversation with Lieutenant Amason, Ghent's supervisor at the time of Phillips's motion for a new trial, in which Amason told the PI that Amason's practice is that a report that goes to the U.S. Attorney's Office or DEA is not recorded into the WPB PD's central records. Although Amason was not Ghent's supervisor as of April 6, 2001, Phillips has not argued that the WPB PD's practice differed then. Furthermore, Ghent's explanation for initiating a case number on March 28, 2001 and continuing to use that number for the April 6 transaction is persuasive.

Phillips wants to use the newly discovered evidence to show that because several witnesses testified that the investigation into Phillips did not begin until at least April 11, 2001, the CI could not have purchased crack cocaine from Phillips on April 6. In Phillips's estimation, this means that Ghent must have confused Black for Phillips or, worse yet, entirely fabricated the April 6 report and other evidence to frame Phillips. Although Kapper's testimony shows that the investigation into Phillips did not begin until at least April 11, Ghent testified that he was not investigating Phillips directly when he went to 625 8th Street on April

38

6. On cross examination, Phillips tried to force Ghent to concede that he was targeting Phillips when Ghent went to 625 8th Street on April 6. Ghent refused to concede the point, instead reiterating that he was investigating 625 8th Street based on several complaints regarding the distribution of illegal narcotics from that location. After investigating the location and seeing Phillips in the area for several months, Ghent wanted to make a series of controlled buys to determine who was in charge at 625 8th Street. Although Ghent had received information that Phillips ran 625 8th Street, Phillips was not the target of Ghent's investigation as of April 6.[17] Consequently, Ghent's testimony that he and a CI purchased crack cocaine from Phillips at 625 8th Street on April 6 is entirely consistent with other testimony that the investigation of Phillips did not begin until at least April 11.

Finally, the fact that the evidence from the April 6 transaction was logged under the case number for Black does not affect our view. The printout to which Phillips cited is replete with mistakes, thus it does not lend credence to Phillips's

[17] Phillips also contends that Ghent's testimony that he was conducting surveillance in the area of 625 8th Street since January is inconsistent with Ghent's affidavit in which he stated that Kapper told him on March 28 that Phillips controlled 625 8th Street, prompting Kapper to describe Phillips's truck and Ghent to examine photos of Phillips. Phillips believes that if Ghent were conducting surveillance in the area since January and Phillips were in the area as the government alleges, Ghent would have known who Phillips was by March 28. Ghent's two statements are consistent, however, because it is perfectly reasonable for Ghent to have conducted *undercover* surveillance since January without learning Phillips's name. Ghent's conversation with Kapper was a way for Ghent to obtain more information about the area in which he was conducting surveillance.

39

argument that Ghent either fabricated the April 6 report or mistook Black for Phillips because the printout is an unreliable source of information.

Phillips's arguments, coupled with the testimony from trial, do not establish that the jury would probably have reached a different result if Phillips had an opportunity to present this "new" evidence at trial. Therefore, we hold that the district court did not abuse its discretion in denying Phillips's motion.

B. *Whether the District Court Erred in Denying Phillips's Motion for a New Trial Based on a* Brady *Violation*

To establish a claim for a new trial based on a *Brady* violation, the defendant must show that: (1) the prosecution suppressed evidence; (2) the evidence suppressed was favorable to the defendant or exculpatory; and (3) the evidence suppressed was material to the issues at trial. *United States v. Burroughs*, 830 F.2d 1574, 1577 (11th Cir. 1987) (citing *Brady v. Maryland*, 373 U.S. 83 (1963)). "Materiality" requires a finding that, had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different. *Id.* at 1578. A "reasonable probability" is one "sufficient to undermine confidence" in the result. *Id.* (citation omitted). We review the district court's ruling for an abuse of discretion. *United States v. Vallejo*, 297 F.3d 1154, 1163 (11th Cir. 2002).

First, we note that Phillips has not alleged that the government suppressed any evidence. Albeit the government provided the April 6 report late, but by providing the report, the government destroyed Phillips's argument that it suppressed evidence. Nevertheless, even assuming that Phillips can satisfy the first step, the materiality inquiry under the *Brady* test is substantially similar to the final step of the Rule 33 test. Having determined that Phillips cannot meet the final step of the Rule 33 test, we conclude based on the same reasoning that there is not a reasonable probability that the outcome of the proceedings would have been different if Phillips had been able to present all his evidence. Therefore, the district court did not abuse its discretion in denying the motion for new trial based on an alleged *Brady* violation.

C. *Whether the District Court Erred in Denying Phillips's Motion for an Evidentiary Hearing*

Whether to hold an evidentiary hearing on a motion for new trial is a decision within the district court's sound discretion. *United States v. Fernandez*, 136 F.3d 1434, 1438 (11th Cir. 1998). "The acumen gained by a trial judge over the course of the proceedings [makes her] well qualified to rule on the basis of affidavits without a hearing." *United States v. Schlei*, 122 F.3d 944, 994 (11th Cir. 1997) (quoting *United States v. Hamilton*, 559 F.2d 1370, 1373-74 (5th Cir. 1977)

41

("Where evidentiary hearings are ordered, it is because of certain unique situations typically involving allegations of jury tampering, prosecutorial misconduct, or third party confession.")).

Fully acknowledging that whether to grant an evidentiary hearing and whether to grant a motion for new trial are separate questions, we nevertheless conclude that the district court did not abuse its discretion in denying Phillips's motion for an evidentiary hearing. This case differs from *United States v. Culliver*, 17 F.3d 349 (11th Cir. 1994) and *United States v. Gates*, 10 F.3d 765 (11th Cir. 1993), the two cases that Phillips cites in support of his claim.

*Culliver* involved the district court granting a motion for new trial without an evidentiary hearing to explore the validity of a witness's affidavit recanting his trial testimony. *Culliver*, 17 F.3d at 349. In that case, the witness and the defendant were formerly involved in a tempestuous relationship in which each often asked to have the other arrested only to drop the charges later. *Id.* at 350. Under those circumstances, the government rightly questioned the witness's motives and the validity of the affidavit, and we held that the district court erred in denying the government's motion for an evidentiary hearing. *Id.* at 350-51.

In *Gates*, following the defendant's conviction, a co-defendant, who had not testified at their joint trial, signed an affidavit listing those involved in the charged

42

bank robberies and stating that Gates was not involved. *Gates*, 10 F.3d at 767 n.1. The district court denied Gates's motion for a new trial without first conducting an evidentiary hearing. *Id.* at 768. We acknowledged that post-trial exculpatory statements by convicted co-defendants must be viewed with caution but held that the district court erred in denying the defendant's motion without first conducting an evidentiary hearing. *Id.*

Phillips's motion differs significantly from those in *Culliver* and *Gates*. This case does not involve a "unique situation," such as a key witness recanting his testimony or a non-testifying co-defendant later exonerating his alleged co-conspirator, in which the district court should have deviated from its usual procedure of not conducting an evidentiary hearing. Instead, in this case, the district court had the opportunity during trial to analyze the credibility of the witnesses that Phillips tried to impugn. To the extent that Phillips tried to assail the witnesses' credibility in light of the new allegations that Ghent fabricated his April 6 report, the district court determined based on the trial testimony and the documentation that the parties submitted that Phillips's contentions lacked sufficient support to warrant an evidentiary hearing. The district court was highly familiar with the testimony of the government's witnesses, and its order demonstrates a thorough grasp and cogent analysis of Phillips's allegations. Under

43

these circumstances, we conclude that the district court did not abuse its discretion in denying Phillip's motion for an evidentiary hearing.

4. *Whether the District Court Erred by Increasing Phillips's Sentence Based on Facts Neither Found by the Jury nor Admitted by the Defendant*

Phillips argues that in light of *United States v. Booker*, which was decided after Phillips was sentenced, the district court erred in: (1) denying his motion to declare the guidelines unconstitutional; (2) treating the guidelines as mandatory; and (3) enhancing his sentence based on factual findings that were contrary to those found by the jury. Specifically, Phillips alleges that the district court made four unconstitutional sentencing decisions. First, the court attributed 67.03 grams of crack cocaine and .2 grams of powder cocaine to him, even though the jury convicted him of conspiring to distribute five or less grams of crack cocaine and of possessing .2 grams of powder cocaine. Second, although the jury acquitted him of all the firearms charges, the district court enhanced his base offense level for possessing a firearm during and in relation to a drug trafficking crime. Third, the district court's decision to enhance his sentence based on its finding that he was the organizer or manager of the conspiracy was erroneous because the jury acquitted him of the charges that involved sales by White, Williams, Yearby, Cooper, and Black. Fourth, the district court improperly applied the armed career criminal

enhancement because the court, in determining that his prior convictions were within the time-period outlined in § 4A1.2, used October 2000 as the date when his involvement in the conspiracy began even though the jury, by acquitting him of the earlier charges, necessarily found that his involvement in the conspiracy began on April 6, 2001.

In *Booker*, the Supreme Court extended to the federal sentencing its earlier holding from *Apprendi v. New Jersey*, in which the Court held that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *United States v. Booker*, 543 U.S. 220, 244 (2005) (citing *Apprendi v. New Jersey*, 530 U.S. 466, 489-90 (2000)). To remedy the unconstitutionality of the guidelines, the *Booker* Court excised 18 U.S.C. § 3553(b)(1), which generally requires a sentence within the guidelines range, and 18 U.S.C. § 3742(e), which establishes the standards of review on appeal. *Id.* at 245-46. The practical effect of the *Booker* decision was to render the guidelines advisory. *Id.* at 246.

We have recognized two distinct forms of *Booker* error: (1) constitutional *Booker* error, which results from using extra-verdict facts to enhance the defendant's sentence; and (2) statutory *Booker* error, which results from applying

45

the guidelines as mandatory instead of as advisory. *United States v. York*, 428 F.3d 1325, 1335 (11th Cir. 2005). Because we find that the district court committed constitutional *Booker* error, we do not address any claims of statutory *Booker* error.

As an initial matter, however, we reject Phillips's argument that the district court's application of the armed career criminal enhancement violated *Booker* because the district court used October 2000 as the date when his involvement in the conspiracy began. Application Note 1 to § 4B1.4 states that the time-periods for counting sentences under § 4A1.2 are inapplicable to the determination of whether a defendant is subject to an enhanced sentence under § 924(e). U.S.S.G. § 4B1.4, cmt. n.1. Furthermore, although the district court found that Phillips was an armed career criminal, his total offense level did not include this enhancement because Phillips's total offense level was 36 using the district court's drug quantity calculation and its assessment of the §§ 2D1.1(b) and 3B1.1(c) enhancements.

The district court committed constitutional *Booker* error when it enhanced Phillips's sentence based on facts not found by the jury, namely the amount of drugs Phillips distributed, Phillips's possession of a firearm during and in relation to a drug trafficking crime, and Phillips's alleged role in the offenses. At his sentencing hearing, Phillips asserted that the district court's use of extra-verdict facts to enhance his sentence violated the Fifth and Sixth Amendment. Because

46

Phillips preserved the argument, we review the issue *de novo* and require the government to prove that the error was harmless. *United States v. Paz*, 405 F.3d 946, 948 (11th Cir. 2005). The government meets its burden if it can demonstrate, beyond a reasonable doubt, that the error did not contribute to the defendant's ultimate sentence. *Id.* (citations omitted)

The jury convicted Phillips of three drug charges: (1) conspiring to distribute five or less grams of crack cocaine; (2) distributing a detectable amount of crack cocaine on or about April 6, 2001; and (3) possessing a detectable amount of powder cocaine on or about June 8, 2001. Based on the evidence, the April 6 transaction involved .77 grams of crack cocaine, and the June 8 possession involved .2 grams of powder cocaine. The jury's verdict supports a conclusion that the amount of drugs attributable to Phillips was five or less grams of crack cocaine and .2 grams of powder cocaine. Based on these amounts, Phillips's maximum offense level was 26. By considering extra-verdict facts, the district court attributed 67.03 grams of crack cocaine and .2 grams of power cocaine to Phillips and gave him a base offense level of 32. Furthermore, although the jury acquitted Phillips of the firearms charges, the district court enhanced Phillips's sentence by two levels based on its finding that he possessed a firearm during and in relation to a drug trafficking conspiracy. Finally, none of the jury's findings supported the

47

district court's decision to enhance Phillip's sentence for being a leader or organizer.

The government cannot meet its burden to demonstrate, beyond a reasonable doubt, that the errors complained of did not contribute to Phillips's sentence. If the court had not considered the extra-verdict facts, Phillips's sentencing range would have been significantly lower. The court's *Booker* error plainly contributed to the sentence that the district court ultimately imposed. Therefore, we vacate Phillips's sentence and remand to the district court for resentencing.

5. *Whether the District Court Erred in Failing to Dismiss Either Count 14 or 17 Based on Multiplicity*

Phillips argues that Counts 14 and 17 are multiplicitous and that we should either dismiss one count or vacate the sentences and remand to the district court for resentencing. The district court did not decide whether the claims are multiplicitous. Instead, the court agreed to merge the counts, gave Phillips thirty years' imprisonment and a $100 assessment for each count, and ran the sentences concurrently.

The government did not cross appeal the district court's decision to merge Counts 14 and 17. Therefore, we are bound by the district court's ruling. By imposing two $100 assessments, however, the district court failed to merge the

sentences properly.  Although we do not decide whether Counts 14 and 17 are multiplicitous, we require the court upon resentencing to properly merge Counts 14 and 17.

### III. Conclusion

For the foregoing reasons, we remand Issues 4 and 5 to the district court for further consideration in light of this opinion.  In all other respects, we affirm the district court.